UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHONY BAILEY, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| CHEMBIO DIAGNOSTICS, INC., RICHARD L. EBERLY, GAIL S. PAGE, and NEIL A. GOLDMAN, | |
| Defendants. | |

Plaintiff Anthony Bailey ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Chembio Diagnostics, Inc. ("Chembio" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired Chembio securities between April 1, 2020, and June 16, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Chembio, together with its subsidiaries, develops, manufactures, and commercializes point-of-care ("POC") diagnostic tests that are used to detect or diagnose diseases.

3.      Amidst the SARS-CoV-2, or COVID-19, pandemic, the Company focused on the development and commercialization of a serological or antibody test.

4.      In April 2020, Chembio's DPP COVID-19 antibody test was among the first such tests to be granted Emergency Use Authorization ("EUA") by the U.S. Food and Drug Administration (the "FDA").

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Chembio's DPP COVID-19 test did not provide high-quality results and there were material performance concerns with the accuracy of the Company's DPP COVID-19 test; (ii) the Company's DPP COVID-19 test generates a higher than expected rate of false results and higher than that reflected in the authorized labeling for the device, and was not effective in detecting antibodies against COVID-19; (iii) accordingly, it was not reasonable to believe that the test may be effective in detecting antibodies against COVID-19 and, as a result, there was a material risk to public health

from the false test results; (iv) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Company's financial results; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.      On June 16, 2020, after the market closed, the FDA issued a press release disclosing that it had revoked Chembio's EUA for the Company's DPP COVID-19 Igm/IgG System, stating, in relevant part:

> Today, the U.S. Food and Drug Administration revoked the emergency use authorization (EUA) of the Chembio Diagnostic System, Inc. (Chembio) DPP COVID-19 IgM/IgG System, a SARS-CoV-2 antibody test, ***due to performance concerns with the accuracy of the test***. Antibody tests, a type of serological test, can help provide information on a person's and population's exposure to COVID-19.

> "Since the beginning of the COVID-19 public health emergency, the FDA has balanced the urgent need for access to diagnostic and antibody tests with providing a level of oversight that helps to ensure accurate tests are being deployed," said Jeff Shuren, M.D., director of FDA's Center for Devices and Radiological Health. "By continuing to monitor authorized tests and emerging scientific evidence, we are able to make changes when appropriate – ***including taking action when a test's benefits no longer outweigh its risks***. Through these efforts, we are able to help assure that FDA-authorized tests meet the needs of the American public."

> The Chembio antibody test was one of the first antibody tests authorized by the FDA during the COVID-19 public health emergency. At the time of authorization, based on the information that Chembio submitted to the FDA at that time, the agency concluded that the test met the statute's "may be effective" standard for emergency use authorization, and that the test's known and potential benefits outweighed its known and potential risks.

> As the FDA has learned more regarding the capability for performance of SARSCoV-2 serology tests during the pandemic, and what performance is necessary for users to make well-informed decisions—through both the continued review and authorization of serology tests as well as through a research partnership with the National Institutes of Health's National Cancer Institute (NCI)— the FDA was able to develop general performance expectations for these tests, which are listed in our serology templates.

> ***Data submitted by Chembio as well as an independent evaluation of the Chembio test at NCI showed that this test generates a higher than expected rate of false results and higher than that reflected in the authorized labeling for the device.***

3

> ***Under the current circumstances of the public health emergency, it is not reasonable to believe that the test may be effective in detecting antibodies against SARS-CoV-2 or that the known and potential benefits of the test outweigh the known and potential risks of the test, including the high rate of false results.*** Moreover, the risk to public health from the false test results makes EUA revocation appropriate to protect the public health or safety. As such, the FDA decided to revoke the emergency use authorization of the Chembio test, and this test may not be distributed.

(Emphases added.)

7.      On June 17, 2020, Chembio filed a Current Report on Form 8-K with the SEC that acknowledged receipt of the FDA's June 16, 2020 letter and stated, in part, the following:

> On June 16, 2020, we received a letter from the U.S. Food and Drug Administration, or FDA, notifying us that the FDA was revoking the Emergency Use Authorization, or EUA, granted in April 2020 with respect to our DPP COVID-19 System, which consists of our serological test for COVID-19 and one of our Micro Reader analyzers. As a result of this decision by the FDA, we may no longer distribute the DPP COVID-19 System.

> \* \* \*

> In its letter of June 16, 2020, the FDA stated that it had decided to revoke the EUA for the DPP COVID-19 System due to performance concerns regarding the sensitivity and specificity of our test system. [. . . .]

> We intend to continue working with the FDA with respect to the modification of the DPP COVID-19 System and of the revocation of the EUA for our test system.

8.      As a result of the disclosure of the FDA letter, Chembio's stock price fell $6.04 per share, or 60.83%, to close at $3.89 per share on June 17, 2020, on heavier than usual volume of over 25 million shares.

9.      After markets closed on June 17, 2020, *Bloomberg* published a report titled "FDA Reversal on Chembio Antibody Test Sends Stock Down 63%" that noted that, in light of the FDA revocation of the Company's EUA, five analysts downgraded Chembio stock.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

13.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Chembio is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15.     Plaintiff, as set forth in the attached Certification, acquired Chembio securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.     Defendant Chembio is a Nevada corporation with principal executive offices located at 555 Wireless Blvd., Hauppauge, NY 11788.  Chembio's common stock trades in an efficient market on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "CEMI."

17.     Defendant Richard L. Eberly ("Eberly") has served as Chembio's President, Chief Executive Officer, and a Director of the Company at all relevant times.

18.     Defendant Gail S. Page ("Page") has served as Chembio's Executive Chair of the Board of Directors at all relevant times.

19.     Defendant Neil A. Goldman ("Goldman") has served as Chembio's Executive Vice President and Chief Financial Officer at all relevant times.

20.     Defendants Eberly, Page, and Goldman are sometimes referred to herein as the "Individual Defendants."

21.     The Individual Defendants possessed the power and authority to control the contents of Chembio's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Chembio's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Chembio, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

22.     Chembio and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Chembio, together with its subsidiaries, develops, manufactures, and commercializes POC diagnostic tests that are used to detect or diagnose diseases.

24.     The Company claims its patented DPP technology platform, which uses a small drop of blood from the fingertip, provides high-quality, cost-effective results in approximately 15 minutes.

25.     Furthermore, the Company asserts that its products "meet the highest standards for accuracy and superior performance to help prevent the spread of infectious diseases" and that its "innovative solutions, like the Chembio Dual Path Platform (DPP®), make POC testing faster, more accurate, and more cost effective."

26.     Amidst the SARS-CoV-2, or COVID-19, pandemic, the Company focused on the development and commercialization of a serological or antibody test.

27.     In April 2020, Chembio's DPP COVID-19 antibody test was among the first such tests to be granted EUA by the FDA.

28.     Throughout the Class Period, Defendants represented that its DPP COVID-19 serological POC test for the detection of IgM and IgG antibodies aided in determining current or past exposure to the COVID-19 virus, that its test provides high sensitivity and specificity, and was 100% accurate.  Test sensitivity is the ability of a test to correctly identify those with the disease (true positive rate), whereas test specificity is the ability of the test to correctly identify those without the disease (true negative rate).

29.    Based on Defendants' representations, during the Class Period Chembio's stock increased from a closing price on March 31, 2020—the day before the start of the Class Period—of $5.12 per share, to a Class Period high of $15.54 per share on April 24, 2020.

**Materially False and Misleading Statements Issued During the Class Period**

30.    The Class Period begins on April 1, 2020.  On March 31, 2020, during after-market hours, Chembio issued a press release announcing the launch of its DPP COVID-19 antibody test. The press release stated, in relevant part:

**IgM/IgG Antibody Results in 15 Minutes from a Simple Finger Stick**

[. . . .] Chembio . . . a leading point-of-care diagnostic company focused on infectious diseases, today announced the U.S. launch of the rapid DPP COVID-19 serological point-of-care test for the detection of IgM and IgG antibodies. These results can be obtained within 15 minutes from a simple finger stick utilizing Chembio's MicroReader 1 and MicroReader 2 analyzers which are produced by Chembio Germany. ***The ability of the DPP platform to provide numerical results can aid clinicians in determining current or past exposure to the COVID-19 virus and monitoring infection progression, while avoiding the human interpretation errors associated with visual readings.***

The DPP COVID-19 test detects antibodies in the blood that are produced by the body in response to a novel coronavirus infection. Numerical readings of the IgM and IgG antibodies have the ability to assist clinicians in determining patients who have been exposed to the novel coronavirus, even among patients who exhibit mild to no symptoms. Detection of an acute infection phase, as determined by the level of IgM antibodies, helps determine if a patient may still be infectious and could possibility transmit the infection to another person. Further along in the infection progression, the body typically starts to produce IgG antibodies, which increase while IgM levels decrease until eventually only IgG antibodies are present, demonstrating prior infection without the ability to transmit the virus.

"***The results and data from our DPP COVID-19 test can help improve clinical outcomes through the management of individual patients by enabling clinicians to understand the likelihood of past and present infection and to manage populations as a whole as a surveillance test***," stated Richard Eberly, Chief Executive Officer of Chembio. "***Our measured approach has positioned us to offer a viable and sustainable long-term solution for clinicians.*** We expect to begin shipping product in April 2020, and we will continue to work with our partner LumiraDx to provide DPP COVID-19 tests with the ability to scale based upon market demand."

8

"We are excited that, through diligent collaboration with the FDA, our test will be distributed as authorized by the FDA Notification process under the public health emergency guidance issued on March 16, 2020," stated Gail S. Page, Chembio director. "This is another example of Chembio's ability to respond in an expeditious manner to global pandemics with differentiated solutions, as demonstrated previously with Zika and Ebola." . . . .

Chembio is a leading point-of-care diagnostics company focused on detecting and diagnosing infectious diseases. ***The company's patented DPP technology platform, which uses a small drop of blood from the fingertip, provides high-quality, cost-effective results in approximately 15 minutes.***

(Emphases added.)

31.     On April 15, 2020, Chembio issued a press release announcing that the Company

had received EUA for its DPP antibody test.  The press release stated, in relevant part:

***First Shipments of the COVID-19 Serological Test have been Released***

[. . . .] Chembio . . . a leading point-of-care diagnostic company focused on infectious diseases, today announced receipt of Emergency Use Authorization (EUA) for its DPP COVID-19 System. The DPP COVID-19 System is a serological test and analyzer that provides numerical readings for both IgM and IgG levels within 15 minutes from a simple finger stick drop of blood. Both Chembio's Micro Reader 1 and Micro Reader 2 analyzers are compatible with the test.

"We are very pleased with the continued progress our teams are making to address the market demands with our DPP COVID-19 serological system," stated Rick Eberly, Chembio's Chief Executive Officer. "***The flexibility of having two analyzers and a system that provides high sensitivity and specificity that is generally consistent with the performance of Chembio's other DPP platform tests as part of our offering places us in a unique position to serve a variety of markets.*** Additionally, we are pleased to announce that our manufacturing team has produced and shipped our first lots of the COVID-19 Systems, and we look forward to providing further product within the US and abroad."

(Second emphasis added.)

32.     On May 4, 2020, Chembio issued a press release announcing the Company's

financial results for the quarter ended March 31, 2020, which stated, in relevant part:

**Recent Accomplishments and Highlights**

- Attained FDA Emergency Use Authorization for the DPP COVID-19 IgM/IgG System serological test
  - o Announced the U.S. launch and shipments to customers of the DPP COVID-19 System
  - o Selected by Stony Brook Medicine as the testing solution to identify COVID-19 survivors for study on COVID-19 convalescent plasma therapy
  - o Received a $4.0 million purchase order from Bio-Manguinhos for our DPP COVID-19 System

* * *

"During the first quarter, we refocused our business strategy to address the escalating need for COVID-19 diagnostic tests. In a short period of time, we developed a COVID-19 serological testing system, received FDA Emergency Use Authorization and began shipping tests to customers in the United States and Brazil in April. *Our differentiated testing system offers numerical discrete detection of both IgM and IgG antibodies in approximately 15 minutes from a fingerstick. Then, in approximately 15 seconds, the DPP COVID-19 System reads the test to provide numerical results using the portable Micro Reader analyzers that are engineered and produced by our wholly owned subsidiary in Germany. Numerical results reduce the possibility of the types of human error that can be experienced in the visual interpretations required by many other serological tests*," said Gail Page, Chembio's Executive Chair of the Board. "We are proud to be serving the needs of clinicians and the broader healthcare community in this time of crisis."

"It has been an extremely productive first few weeks in my new role as CEO. Amid these challenging circumstances, the skill and hard work of this team has enabled a successful strategic pivot as we prioritize manufacturing and commercialization of our DPP COVID-19 System," said Richard Eberly, Chembio's Chief Executive Officer. "Through efficient use of our resources and technical ability, we are scaling production of these tests due to the strong demand we are experiencing. We believe the features and benefits offered by our DPP COVID-19 System will make it a preferred solution."

(Emphasis added.)

33.    That same day, Chembio filed a Quarterly Report on Form 10-Q with the SEC,

reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the

"Q1 2020 10-Q").  While providing a business update, the Q1 2020 10-Q stated, in relevant part:

We believe we have a proven track record in rapidly responding to global health emergencies. Building upon our extensive experience in developing and

10

manufacturing high-quality HIV tests, we received EUAs for DPP tests related to the global outbreak of Ebola, which began in 2014, and Zika, which commenced in 2015. When the novel coronavirus emerged, we were confident that we could leverage our DPP platform and our scientific and operational expertise to create an antibody test that could detect and diagnose the presence, or former presence, of antibodies generated in response to the virus. DPP technology is an advanced, versatile lateral flow testing platform with the capability to multiplex, or detect multiple biomarkers, from a single patient sample. The speed with which we were able to develop a test for COVID-19 illustrates the DPP platform's applicability to new and emerging infectious diseases.

During three months ended March 31, 2020 we refocused our business strategy to apply our DPP technology to address the escalating need for COVID-19 diagnostic tests, including tests that can be performed both close to the patient and at a laboratory or hospital. In February 2020 we began the process of shifting substantially all of our resources to the development and commercialization of the DPP COVID-19 System, which consists of our new serological test for COVID-19 and our Micro Reader analyzer. In the latter half of the first quarter of 2020, we developed and in preparation for commercialization, began to manufacture the DPP COVID-19 System.

The DPP COVID-19 System detects antibodies in the blood that are produced by the body in response to a novel coronavirus infection. Detection of an acute infection, as determined by the level of IgM antibodies, helps determine if a patient is still infectious. As the infection progresses, the body typically begins to produce IgG antibodies. The IgG antibody levels increase, while IgM antibody levels decrease and eventually disappear. IgG antibodies remain, evidencing the earlier infection. It is not currently known how long IgG antibodies to coronavirus remain in the body.

The DPP COVID-19 System offers discrete detection of IgM and IgG antibodies, with high sensitivity and specificity, from a simple fingerstick drop of blood after approximately 15 minutes of reaction time. Using our portable Micro Reader analyzer, the DPP COVID-19 System produces numerical results in approximately 15 seconds. Numerical readings of each of the IgM and IgG antibodies can assist in identifying patients who have been exposed to the novel coronavirus, even patients who exhibit mild, or no, symptoms. Numerical results reduce the possibility of the types of human error that can be experienced in the visual interpretations required by many other serological tests. Because the reader processing requires approximately 15 seconds and is independent of the processing of tests, the DPP COVID-19 System can process more than 200 tests per hour, making it appropriate for high-volume applications.

34.     Appended as an exhibit to the Q1 2020 10-Q were signed certifications pursuant to

the Sarbanes-Oxley Act of 2002, wherein Defendants Eberly and Goldman certified that "the [Q1

2020 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "the information contained in the [Q1 2020 10-Q] fairly presents, in all material respects, the financial condition and results of operations of Chembio Diagnostics, Inc. for the period presented therein."

35.    On May 11, 2020, Chembio issued a press release titled "Chembio Diagnostics Announces Closing of Public Offering of Common Stock" that stated, in relevant part:

> Chembio . . . a leading point-of-care diagnostic company focused on infectious diseases, announced today the closing of its previously announced public offering of 2,619,593 shares of its common stock, which included 281,125 shares issued pursuant to the partial exercise by the underwriters of their option to purchase additional shares, at a public offering price of $11.75 per share for gross proceeds of approximately $30.8 million. All shares of common stock sold in the offering were offered by Chembio.

36.    On May 18, 2020, Chembio issued a press release titled "Chembio Diagnostics Announces US Distribution Agreement to Expand Reach of DPP COVID-19 Serological Test with Thermo Fisher Scientific's Healthcare Channel" that stated, in relevant part:

> Chembio . . . a leading point-of-care diagnostic company focused on infectious diseases, today announced it has signed a multi-year, nonexclusive agreement with Thermo Fisher Scientific's healthcare channel, to distribute Chembio's DPP COVID-19 System in the United States. ***The DPP COVID-19 System is a rapid serological test and analyzer that provides numerical readings for both IgM and IgG antibody levels within 15 minutes from a finger stick drop of blood***. The DPP COVID-19 System can include either Chembio's Micro Reader 1 or Micro Reader 2 analyzer.
>
> "We are pleased to announce our strategic supplier partnership with the Fisher Healthcare channel, which will significantly increase our commercial footprint by providing access to thousands of hospital and physician office moderately complex labs across the country," stated Rick Eberly, Chembio's President and Chief Executive Officer. "We have initiated a comprehensive training and marketing program for the Fisher Healthcare channel sales team, in order to expand the targeted coverage for this important segment of the market as soon as possible."

(Emphasis added.)

37.     The statements referenced in ¶¶ 30-36 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Chembio's DPP COVID-19 test did not provide high-quality results and there were material performance concerns with the accuracy of the Company's DPP COVID-19 test; (ii) the Company's DPP COVID-19 test generates a higher than expected rate of false results and higher than that reflected in the authorized labeling for the device, and was not effective in detecting antibodies against COVID-19; (iii) accordingly, it was not reasonable to believe that the test may be effective in detecting antibodies against COVID-19 and, as a result, there was a material risk to public health from the false test results; (iv) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Company's financial results and reputation; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

38.     On June 16, 2020, after the market closed, the FDA issued a press release disclosing that it had revoked Chembio's EUA for the Company's DPP COVID-19 Igm/IgG System:

> Today, the U.S. Food and Drug Administration revoked the emergency use authorization (EUA) of the Chembio Diagnostic System, Inc. (Chembio) DPP COVID-19 IgM/IgG System, a SARS-CoV-2 antibody test, *due to performance concerns with the accuracy of the test*. Antibody tests, a type of serological test, can help provide information on a person's and population's exposure to COVID-19.
>
> "Since the beginning of the COVID-19 public health emergency, the FDA has balanced the urgent need for access to diagnostic and antibody tests with providing a level of oversight that helps to ensure accurate tests are being deployed," said Jeff Shuren, M.D., director of FDA's Center for Devices and Radiological Health. "By continuing to monitor authorized tests and emerging scientific evidence, we are able to make changes when appropriate – *including taking action when a test's*

***benefits no longer outweigh its risks***. Through these efforts, we are able to help assure that FDA-authorized tests meet the needs of the American public."

The Chembio antibody test was one of the first antibody tests authorized by the FDA during the COVID-19 public health emergency. At the time of authorization, based on the information that Chembio submitted to the FDA at that time, the agency concluded that the test met the statute's "may be effective" standard for emergency use authorization, and that the test's known and potential benefits outweighed its known and potential risks.

As the FDA has learned more regarding the capability for performance of SARSCoV-2 serology tests during the pandemic, and what performance is necessary for users to make well-informed decisions—through both the continued review and authorization of serology tests as well as through a research partnership with the National Institutes of Health's National Cancer Institute (NCI)— the FDA was able to develop general performance expectations for these tests, which are listed in our serology templates.

***Data submitted by Chembio as well as an independent evaluation of the Chembio test at NCI showed that this test generates a higher than expected rate of false results and higher than that reflected in the authorized labeling for the device. Under the current circumstances of the public health emergency, it is not reasonable to believe that the test may be effective in detecting antibodies against SARS-CoV-2 or that the known and potential benefits of the test outweigh the known and potential risks of the test, including the high rate of false results.*** Moreover, the risk to public health from the false test results makes EUA revocation appropriate to protect the public health or safety. As such, the FDA decided to revoke the emergency use authorization of the Chembio test, and this test may not be distributed.

(Emphases added.)

39.     On June 17, 2020, Chembio filed a Current Report on Form 8-K with the SEC that

acknowledged receipt of the FDA's June 16, 2020 letter and stated, in relevant part, the following:

On June 16, 2020, we received a letter from the U.S. Food and Drug Administration, or FDA, notifying us that the FDA was revoking the Emergency Use Authorization, or EUA, granted in April 2020 with respect to our DPP COVID-19 System, which consists of our serological test for COVID-19 and one of our Micro Reader analyzers. As a result of this decision by the FDA, we may no longer distribute the DPP COVID-19 System.

* * *

In its letter of June 16, 2020, the FDA stated that it had decided to revoke the EUA for the DPP COVID-19 System due to performance concerns regarding the sensitivity and specificity of our test system. [. . . .]

We intend to continue working with the FDA with respect to the modification of the DPP COVID-19 System and of the revocation of the EUA for our test system.

40.     As a result of the disclosure of the FDA letter, Chembio's stock price fell $6.04 per share, or 60.83%, to close at $3.89 per share on June 17, 2020, on heavier than usual volume of over 25 million shares.

41.     After markets closed on June 17, 2020, *Bloomberg* published a report titled "FDA Reversal on Chembio Antibody Test Sends Stock Down 63%" that noted that, in light of the FDA revocation of the Company's EUA, five analysts downgraded Chembio stock.

42.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Chembio securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Chembio securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can

be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Chembio or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

47. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Chembio;

- whether the Individual Defendants caused Chembio to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Chembio securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

49.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Chembio securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Chembio securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

50.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

51.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

52.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

53.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

54.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Chembio securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Chembio securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

55.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Chembio securities.  Such reports, filings, releases and statements were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Chembio's finances and business prospects.

56.    By virtue of their positions at Chembio, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

57.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Chembio, the Individual Defendants had knowledge of the details of Chembio's internal affairs.

58.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Chembio.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Chembio's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Chembio securities was artificially inflated throughout the Class Period.  In

ignorance of the adverse facts concerning Chembio's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Chembio securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

59.    During the Class Period, Chembio securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Chembio securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Chembio securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Chembio securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

60.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

61.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

62.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

63.     During the Class Period, the Individual Defendants participated in the operation and management of Chembio, and conducted and participated, directly and indirectly, in the conduct of Chembio's business affairs.  Because of their senior positions, they knew the adverse non-public information about Chembio's misstatement of income and expenses and false financial statements.

64.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Chembio's financial condition and results of operations, and to correct promptly any public statements issued by Chembio which had become materially false or misleading.

65.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Chembio disseminated in the marketplace during the Class Period concerning Chembio's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Chembio to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Chembio within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Chembio securities.

66.    Each of the Individual Defendants, therefore, acted as a controlling person of Chembio.  By reason of their senior management positions and/or being directors of Chembio, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Chembio to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Chembio and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

67.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Chembio.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  July 3, 2020

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

PORTNOY LAW FIRM
Lesley F. Portnoy, Esq.
8240 Beverly Blvd., Suite 9
Los Angeles, California 90048
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Attorneys for Plaintiff*

DocuSign Envelope ID: A2043A45-EAEA-4DCE-855D-0BE45886C35E

## SWORN CERTIFICATION OF PLAINTIFF

### Chembio Diagnostics, Inc. Securities Litigation

I, ___Anthony Bailey___, certify that:

1. I have reviewed the complaint and authorize its filing and/or the filing of a lead plaintiff motion on my behalf.

2. I am duly authorized to institute legal action against Chembio Diagnostics, Inc. and other defendants.

3. I did not purchase Chembio Diagnostics, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

4. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

5. My transactions in Chembio Diagnostics, Inc.securities during the class period set forth in the complaint are as follows:

   (See attached transactions)

6. I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years.

7. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under the penalty of perjury that the foregoing are true and correct statements.

6/17/2020
_____
Date

DocuSigned by:

*Anthony Bailey*
B0F3516D9CD04E4...

**Chembio Diagnostics, Inc. (CEMI)**                                    **Bailey, Anthony**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 4/16/2020 | 375 | $11.6200 |
| Purchase | 4/20/2020 | 100 | $14.1400 |